J-A07031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARISSA KELLER | : | No. 312 EDA 2018 |

Appeal from the Order Entered December 21, 2017
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0002177-2016

BEFORE:   OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:          **FILED APRIL 08, 2019**

The Commonwealth appeals from the Order entered in the Court of Common Pleas of Montgomery County on December 21, 2017, vacating the jury's verdict convicting Appellee Carissa Keller of simple assault and endangering the welfare of a child and further granting Appellant a new trial due to the alleged ineffective assistance of trial counsel, Evan Hughes, Esquire.  Following a careful review, we reverse.

The trial court prepared a detailed and accurate statement of facts and procedural history.  As the parties have not contested the trial court's recitation of these events, we incorporate it herein by reference. **See** Trial Court Opinion, filed 8/15/18, at 1–19.

On January 18, 2018, the Commonwealth filed its Notice of Appeal from the trial court's decision entered on December 21, 2017.  On February 7, 2018,

_____
*   Former Justice specially assigned to the Superior Court.

the trial court directed the Commonwealth to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the Commonwealth complied on February 27, 2018.

In its brief, the Commonwealth presents the following Statement of the Question Involved:

> I.    Whether the trial court erred in granting [Appellee] a new trial on the basis of ineffective assistance of trial counsel where it (1) misapplied the reasonable basis prong of the ineffectiveness test when it found counsel had no reasonable strategic basis for his conduct even though counsel did not testify at the evidentiary hearing, and (2) improperly relied on the "cumulative effect" of counsel's purported errors

Commonwealth's Brief at 5.

Initially, we note that in **Commonwealth v. Holmes**, 621 Pa. 595, 79 A.3d 562 (2013), the Pennsylvania Supreme Court reiterated the general rule that claims focusing on counsel's performance presumptively should await collateral review, with two exceptions:

> First, we appreciate that there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and we hold that trial courts retain their discretion to entertain such claims.
>                    ....
> Second, with respect to other cases and claims, including cases such as **Bomar**[1] and the matter *sub judice*, where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record-based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown, and (2) the unitary review so indulged is preceded by the

---

[1] **Commonwealth v. Bomar**, 573 Pa. 426, 826 A.2d 831 (2003).

defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA. In other words, we adopt a paradigm whereby unitary review may be available in such cases only to the extent that it advances (and exhausts) PCRA review in time; unlike the so-called **Bomar** exception, unitary review would not be made available as an accelerated, extra round of collateral attack as of right.... This exception follows from the suggestions of prior Court majorities respecting review of prolix claims, if accompanied by a waiver of PCRA review.

**Holmes**, 621 Pa. at 598-99, 79 A.3d at 563-64 (footnotes omitted).

Thus, under **Holmes**, claims of ineffective assistance of counsel may be reviewed by a trial court if (i) the ineffectiveness is apparent from the record and meritorious such that immediate consideration best serves the interests of justice or (ii) if (1) there is good cause shown, and (2) the unitary review so indulged is preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence.

Herein, the Commonwealth did not oppose Appellee's request to seek unitary review of her ineffective assistance of counsel claims in light of the short duration of the one year of probation she had received, provided that Appellee would waive her later rights pursuant to the Post Conviction Relief Act (PCRA).[2]   At the outset of the hearing held on December 19, 2017, (hereinafter "PCRA Hearing"), the trial court permitted Appellee to proceed by way of seeking unitary relief after she executed a written waiver of her

_____

[2] 42 Pa.C.S.A. §§ 9541-9546.

subsequent PCRA rights and the court colloquied her regarding her decision on the witness stand. *See* N.T. PCRA Hearing, 12/19/17, at 5-9; Exhibit D-1. Appellee had the opportunity to develop the claims of counsel's ineffectiveness initially presented in her post-sentence motions at the evidentiary hearing, and the trial court has addressed those claims in its Opinion filed pursuant to Pa.R.A.P. 1925(a) on August 15, 2018. Therefore, we will review the Commonwealth's issue presented on appeal and doing so are governed by the following standard:

> [C]ounsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. ***Strickland v. Washington,*** 466 U.S. 668 [ ] (1984). This Court has described the ***Strickland*** standard as tripartite by dividing the performance element into two distinct components. ***Commonwealth v. Pierce,*** [ ] 527 A.2d 973, 975 ( [Pa. ]1987). Accordingly, to prove counsel ineffective, the petitioner must demonstrate that (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the petitioner was prejudiced by counsel's act or omission. ***Id.*** A claim of ineffectiveness will be denied if the petitioner's evidence fails to satisfy any one of these prongs.

***Commonwealth v. Busanet,*** 618 Pa. 1, 18, 54 A.3d 35, 44 (2012), *cert. denied*, 571 U.S. 869, 134 S.Ct. 178 (2013). Furthermore, "[i]n accord with these well-established criteria for review, [an appellant] must set forth and individually discuss substantively each prong of the ***Pierce*** test." ***Commonwealth v. Fitzgerald,*** 979 A.2d 908, 910 (Pa.Super. 2009), *appeal denied*, 605 Pa. 694 (2010).

The Commonwealth's argument is twofold, and it initially contends the trial court erroneously determined that trial counsel had no reasonable basis for his trial strategy despite the fact that counsel did not testify at the PCRA hearing. A review of the record reveals the trial court stated numerous times at the PCRA hearing that the Commonwealth would be permitted to question Attorney Hughes. For example, when the Commonwealth objected to questions regarding a conversation Appellee had had with Attorney Hughes, the trial court indicated "Mr. Hughes is someone the Commonwealth can ask of [Appellate Counsel Dennis P. Caglia] can ask, but it does not mean the conversation cannot be relayed in this form, based on this witness's conversations that she had and what she experienced." N.T. PCRA Hearing, 12/19/17, at 24.

In addition, upon noting that Attorney Hughes had been subpoenaed to testify and contacted the trial court on Friday, December 15, 2017, after the close of business indicating he would be in court in Connecticut on the day of the hearing, the trial court represented to the ADA, Attorney Todd N. Barnes, the following:

> I will just state on the record, if you feel you need Mr. Hughes, I will give the Commonwealth a continuance to enable you to have him come in and we can reschedule. We can bifurcate this and have this continued the first week in January to give you sufficient time to subpoena Mr. Hughes. . . .

In response, the Commonwealth posited that to sustain her burden of proof, Appellee would need to have Attorney Hughes address his strategy to show whether he had a reasonable basis for his actions or inaction. *Id*. at 35-36.

Also, at the conclusion of argument and prior to entering its Order, the trial court again stated:

> THE COURT: The [c]ourt does not feel based on the evidence presented, the trial transcript, which the [c]ourt has reviewed, and the arguments of counsel, that it needs any further testimony. But as I did state on the record previously, while Mr. Hughes was subpoenaed for today by the Commonwealth and never informed the Commonwealth he was unavailable to attend and did not inform the [c]ourt until after the close of business on Friday, and today is Tuesday, that if either counsel wishes to have Mr. Hughes present for examination, I will permit that.
>
> …
>
> THE COURT: And Mr. Barnes, would the Commonwealth wish to have Mr. Hughes present?
> MR. BARNES: The Commonwealth believes he needs to be present for reasons already stated, Your Honor.
> THE COURT: Meaning that defense has the obligation of putting Mr. Hughes on the stand to support [its] case?
>
> Mr. BARNES: Correct, Your Honor.

*Id*. at 70.

Yet, without reason, the trial court did not bifurcate the matter as earlier promised and, instead, entered its Order a few moments later without providing the Commonwealth with its requested opportunity to have Mr. Hughes present for examination. *Id*. at 74-75. The trial court did so after noting that a number of Appellee's claimed instances of counsel's ineffectiveness:

- 6 -

> were either cured by the [c]ourt, such as the voir dire questions were given, had no prejudice, for example, the character witnesses who testified favorably for [Appellee], and the failure to file motion to suppress based on the [c]ourt's review of the facts presented in this case, the motion to suppress would have failed and would have been denied. So, therefore, those are examples of concerning actions by defense counsel but would not have prejudiced [Appellee].

*Id*. at 72.

Nevertheless, the trial court thereafter repeatedly stated that the "cumulative effect" of Attorney Hughes' apparent unpreparedness for trial, including "specific comments and evidence he brought out that could not have been permitted in this courtroom[,]" such as prior visits to Appellee's home from CYS and disciplinary actions taken against A.K. and her brother, were prejudicial to Appellee in that there could have been no strategic basis for such actions. *Id*. at 72, 74.

The trial court further explained the reasoning behind its finding that Attorney Hughes' representation of Appellee had been ineffective in its Rule 1925(a) Opinion as follows:

> Instantly, the record reflects that Evan Hughes was ineffective trial counsel for [Appellee]. Specifically, and as outlined in the factual and procedural history sections *supra*, Mr. Hughes had no reasonable, strategic basis for eliciting prejudicial information [from] [Appellee] during the trial. He failed to meet with character witnesses prior to trial and go over their testimony. (**See**, *e.g.,* N.T. - Jury Trial at 34, (J.K, A.K.'s brother, testifies he has not met Evan Hughes ever before); 41 ([Appellee's] mother testifies to same) 1/20/17.) Mr. Hughes raised additional details regarding prior, unfounded OCY/CYS investigations, which were not first elicited by the Commonwealth but were spontaneously testified to by A.K. on direct examination, and which would have been otherwise inadmissible by the Commonwealth. (**Id**. at 69-75; N.T. - Jury Trial at 49-52, 1/20/17.) Particularly, Mr. Hughes

raised the issue of [Appellee's] prior aggression toward her children when punishing same. (*Id*.) Despite A.K.'s long history of contact with the juvenile dependency and delinquency systems, Mr. Hughes neglected to question A.K. regarding her incorrigible behavior and history, which would have supported his intent to claim [Appellee's] use of corporal punishment was necessary. (*See* N.T. - Jury Trial at 15-16, 40, 58, 63-64, 68, 70, 1/19/17.) Instead, Mr. Hughes elicited prejudicial testimony from A.K. on cross-examination, such that she was fearful of her mother getting physical with her when she was expecting to be disciplined for her bad behavior. (*Id*. at 63, 67-75.) Mr. Hughes also emphasized the additional damage that was caused by [Appellee] to A.K.'s previously-injured eye. (*Id*. at 41 (argument by Dennis Caglia, Esquire, with citations to the trial record from day 1, pages 60, 62, 64, and 67-68).) **The cumulative effect of these actions and/or inactions by Mr. Hughes illustrated to the trial court his lack of any trial strategy, which contributed to the trial court's ultimate finding of ineffectiveness and lack of strategy for raising the prejudicial evidence noted above**.

The trial court notes that it does not take a stance one way or the other as to the ultimate guilt or innocence of [Appelee] with respect to the charges against her; however, the court opines the matter here presents a case of a single, hard-working mother who was unfortunately not equipped with the best parenting skills, and as a result, had trouble with her teenage children. **The trial court opines that A.K.'s stabbing of her brother and subsequent suspension from school for threatening her own friend was the "straw on the camel's back" for this [Appellee]" who went on to give A.K. a physical beating**. **The ultimate issue of whether that physical encounter between Defendant and A.K. on November 19, 2015, amounted to allowable corporal punishment, or exceeded the bounds of the law, is up to a jury.** Nevertheless, and most importantly in our criminal justice system, is [Appellee's] right to a fair trial and effective representation. The trial court properly found here that Mr. Hughes did not represent [Appellee] effectively at trial due to his lack of trial strategy and introduction of prejudicial evidence against [Appellee], and as such, ordered the jury verdict vacated and a new trial.

Trial Court Opinion, field 8/15/18, at 27-28 (emphasis added).

As the above excerpt evinces, the trial court "opines" Appellee's actions constituted a "physical beating" and that it was "up to a jury" to determine whether such beating "exceeded the bounds of the law;" yet, the trial court effectively substituted its judgment for that of the fact finder by deducing that but for the "cumulative effect" of various alleged trial counsel errors, regarding which it prevented Attorney Hughes from testifying, the verdict would have differed.

To the contrary, a review of the record reveals Appellee failed to meet her heavy burden of establishing that Attorney Hughes rendered ineffective assistance such that she is entitled to a new trial. As the Pennsylvania Supreme Court has stated:

> [A]t a minimum, to establish the reasonable basis prong, a PCRA petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Johnson makes no attempt to satisfy this standard, failing entirely in his present brief to proffer any compelling advocacy on this point. Instead, Johnson baldly asserts that counsel "could have had no reasonable strategic basis for failing to raise each instance." Brief for Johnson at 42. In effect, Johnson is claiming that counsel could have had no reasonable basis for declining to pursue these issues. We cannot accept such an argument. . . . It is Johnson's burden to elicit counsel's reasons, and to demonstrate that the chosen course of action by counsel was objectively unreasonable in light of the alternatives. Johnson's bald claim that there could not have been a reasonable basis falls short of satisfying this burden. Johnson has not established that he is entitled to a hearing on this claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 697, 139 A.3d 1257, 1276 (2016) (citations omitted).

In this regard, we find instructive this Court's prior decision in **Commonwealth v. Perry**, 128 A.3d 1285 (Pa.Super. 2015), *appeal denied*, 636 Pa. 648, 128 A.3d 1285 (2016). Therein, the Commonwealth presented the following, singe issue for our consideration: "Whether the PCRA court erred in finding [Perry's] appellate attorney ineffective when [Perry's] appellate attorney was not presented as a witness at his PCRA evidentiary hearing and no testimony was offered from [Perry's] appellate attorney to be considered in the court's determination of appellate counsel's effectiveness [.]" *Id*. at 1289 (brackets in original).  This Court ultimately held Perry had failed to demonstrate his appellate counsel had been ineffective for failing to assert on appeal that Appellant was entitled to a new trial in light of the jury's access to unmarked evidence during its deliberations even where trial counsel concluded at the PCRA hearing that appellate counsel had been ineffective. *Id*. at 1290.  Noting that the trial court had based its decision upon trial counsel's irrelevant opinion of her colleague's ineffectiveness, this Court stressed:

> [o]ur Supreme Court has cautioned that, "[a]s a general rule, a lawyer should not be held ineffective without first having an opportunity to address the accusation in some fashion." **Commonwealth v. Koehler***, 614 Pa. 159, 36 A.3d 121, 132 (2012). "The ultimate focus of an ineffectiveness inquiry is always upon counsel, and not upon an alleged deficiency in the abstract." *Id*. Stated simply, the record before us is devoid of any evidence to overcome the presumption that counsel was effective. Perry's failure to demonstrate that appellate counsel had no reasonable basis for her actions is fatal to his IAC claim. **See** [**Commonwealth v.**] **Rathfon**,[899 A.2d 365 (Pa.Super. 2006)] (stating that a PCRA petitioner bears the burden of pleading and

- 10 -

proving each of the **_Pierce_** factors by a preponderance of the evidence).

**_Id_**. at 1290.

While this Court's holding in **_Perry_** did not establish a blanket rule requiring a PCRA petitioner to call counsel whose effectiveness is being challenged, we did find that without testimony from appellate counsel, the PCRA court could not determine whether counsel had a reasonable basis for his actions which was fatal to Perry's ineffectiveness claim. Similarly, without Attorney Hughes' testimony herein, the PCRA court could not determine his strategy for eliciting certain information on direct and cross-examination. Indeed, there are a number of reasons why trial counsel might make such a strategic choice, but because Attorney Hughes did not testify, it was impossible for the PCRA court to determine whether or not his method of questioning was the product of a reasonable strategic choice.

Moreover, the record reveals that contrary to the trial court's contention that Mr. Hughes was ineffective for failing to meet with character witnesses prior to trial, he did question Appellee's son and mother regarding Appellee's reputation as being law abiding and as not being known as a violent person. Counsel further stipulated that two, additional character witnesses would present similar testimony.   **_Id_**. at 33-44.

Also, the trial court states that Mr. Hughes was ineffective for raising "additional details" regarding investigations of Appellee by the Office of Children and Youth Services (hereinafter "OCY") which ultimately were

determined to be unfounded and to which A.K. spontaneously testified on direct examination. Importantly, Mr. Hughes did not initiate A.K.'s testimony regarding OCY's visit to Appellee's home. Rather, during the direct examination of William H. Neely, Jr., Appellee's then-fiancée, Attorney Hughes questioned Mr. Neely concerning Appellee's mothering style. In response, Mr. Neely indicated that while she would yell at her children, Appellee cared deeply for them and never physically punished them in his presence. N.T. Trial, 1/20/17, at 23-26. On cross-examination, Mr. Neely stated that OCY had been involved in an investigation of one of Appellee's sons. N.T. Trial, 1/20/17, at 32. On redirect, Mr. Hughes asked Mr. Neely to clarify that the result of the investigation was unfounded. *Id*. at 32-33. Also, during his direct examination of his Appellee, Attorney Hughes had Appellee clarify the prior involvement of the OCY with her family, at which time she explained how the contact resulted in unfounded findings. *Id*. at 49-52.

The trial court also faults Attorney Hughes for eliciting "prejudicial testimony" from A.K. on cross-examination concerning her fear of her mother's physical punishment for her bad behavior and the additional damage Appellee caused to A.K.'s already-injured eye; however, a review of the testimony in context reveals this was not the case:

> Q: As a child living in your mother's home, you were not fearful, correct?
> A: I was scared when I got in trouble, but that's about it.
> Q: Were you ever scared of your mother if you weren't in trouble?
> A: No.

N.T. Trial, 1/19/17, at 63.

It is not unusual for a child to be fearful when he or she gets into trouble, and at no time did A.K. state she was afraid of the corporal punishment she would receive each time she did so. A.K. explained she did not get beaten on a regular basis when she got in trouble.

The trial court reasons the "cumulative effect of these actions and/or inactions" illustrates a lack of trial strategy on the part of Attorney Hughes and led to its ultimate finding of his ineffectiveness. Trial Court Opinion, filed 8/15/18, at 27. In doing so, the trial court ignores the well-settled principle that no number of failed claims collectively may warrant relief if they fail to do so individually. *Commonwealth v. Smith*, 181 A.3d 1168, 1187, (Pa. Super. 2018), *appeal denied,* ___ Pa. ____, 193 A.3d 344 (2018).

Furthermore,

> "[r]elating to the reasonable basis prong, [g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Koehler*, 614 Pa. 159, 36 A.3d 121, 132 (2012) (quotations and citation omitted). Courts should not deem counsel's strategy or tactic unreasonable unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.* (quotations and citation omitted). To demonstrate prejudice in an ineffective assistance of counsel claim, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 613 (2012).

*Commonwealth v. Durrett King*, 195 A.3d 255, 259 (Pa.Super. 2018).

- 13 -

At the evidentiary hearing, Appellee presented only her own testimony as to her relationship with trial counsel. She briefly spoke about her fee agreement with Attorney Hughes, the number of times the two met, the preliminary hearing, and whether ARD was offered to her. N.T. PCRA Hearing 12/19/17, at 10-27. Appellee explained Attorney Hughes asked her if she had had any prior contact with OCY and explained he told her "they will probably bring it up, so I need to know the facts of it." *Id*. at 22. Appellee also stated that she provided Attorney Hughes with names of certain character witnesses, but he did not contact those individuals; however, she also admitted he did call character witnesses to speak on her behalf. *Id*. at 27-28.

The two discussed trial strategy, and counsel informed Appellee he would not put A.K. through difficult questioning in light of what she had been through and because "it would look bad if a man berated a young girl on the stand." *Id*. at 28. At no time did Appellee prove, or even attempt to prove, that the result of her proceeding would have been different but for Attorney Hughes' chosen course of action.

To the contrary, during his closing argument Attorney Hughes expressed exactly what the trial court said he should have- that Appellee was not an abusive parent but rather a hard working mother disciplining her unruly children in an appropriate and reasonable manner. N.T. Trial, 1/20/17, at 2-4. Attorney Hughes expressly detailed for the jury the law pertaining to corporal punishment, justifiable use of force, and reasonable doubt. *Id*. at 5-

9. Attorney Hughes stated that while A.K. testified she experienced extreme pain at the hands of her mother, the necessary intent on the part of Appellee to inflict such pain was lacking; therefore, her actions were done with an intent to punish her child not to cause extreme pain. *Id*. at 9-11.

In light of all of the foregoing, we hold the PCRA court erred in granting Appellee a new trial upon concluding that trial counsel had been ineffective. Because the PCRA court's decision is unsupported by the certified record, we reverse its December 21, 2017, Order granting Appellee's petition for relief.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/8/19

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :         Common Pleas Court No.:
                                        :         CP-46-CR-0002177-2016

v.                                          :

                                          :         Superior Court No.:
CARISSA KELLER                          :          312 EDA 2018

## OPINION

**WEILHEIMER, J.**                                          **August 15, 2018**

The Commonwealth ("Appellant") instantly appeals to the Superior Court of Pennsylvania ("Superior Court") from the December 19, 2017, Order[1] entered by this Court of Common Pleas of Montgomery County ("trial court"), which vacated the jury's verdict convicting the underlying Defendant, Carissa Keller, of simple assault and endangering the welfare of a child, and further granted Defendant a new trial due to the ineffective assistance of trial counsel, Evan Hughes, Esquire. While the trial court noted Mr. Hughes' actions/inactions in this matter were cumulatively ineffective, the trial court's rationale was based upon Mr. Hughes unpreparedness and complete lack of trial strategy as evinced by the record. In particular, the trial court found Mr. Hughes was ineffective for introducing highly prejudicial facts against Defendant that were not first elicited by the Commonwealth and would not have been admissible if solicited by the Commonwealth, *i.e.*, details about prior unfounded OCY/CYS investigations into Defendant and details about past physical discipline of A.K. and her siblings by Defendant. Based upon the following, said December 19, 2017, Order should be affirmed.

*The rest of this page was intentionally left blank.*

---

[1] The trial court's ruling was made orally on the record after the underlying Defendant's December 19, 2017, evidentiary hearing, and was later memorialized in a written memorandum, issued on December 20, 2017 and docketed on December 21, 2017.

# FACTUAL HISTORY

The factual history of the instant matter can be summarized concisely as follows: On January 20, 2017, the underlying Defendant was convicted by a jury of Count 1 (Simple Assault), *i.e.*, causing bodily injury to her minor daughter, A.K., who was fifteen (15) years' old when the incident occurred on November 19, 2015[2]. (*See* Bill of Information, 4/29/18; N.T. – Jury Trial at 40:3-4, 1/19/17.) In doing so, and Defendant being the parent supervising the welfare of A.K., a child under the age of eighteen (18) years of age, Defendant was also convicted by the jury of Count 2 (Endangering the Welfare of a Child), *i.e.*, violating her duty of care, protection, and support of said minor child. (*See* Bill of Information, 4/29/18.) The focus of this case should have been whether the Defendant appropriately used corporal punishment to reprimand her child (A.K) for her incorrigible behavior, or if Defendant's actions exceeded the bounds of corporal punishment thereby constituting an assault.

The set of circumstances giving rise to the instant case were set in motion on November 17, 2015, when an altercation occurred between A.K. and her brother while Defendant was at one (1) of her two (2) jobs. The altercation escalated to the point of A.K. stabbing her also-teenage brother, slicing his hand and forcing him to seek medical attention at a hospital. (*See* N.T. – Jury Trial at 35, 41, 88, 1/19/17.) At only fifteen (15) years' old and in ninth grade, A.K., a petite girl, stabbed her older, taller, larger brother[3], causing him to fear for his life and to be around A.K. (*Id.* at 15, 41-42, 100-02; N.T. – Jury Trial at 53-54, 1/20/17.) Defendant stated that she believed A.K. was constantly beating on her brother because he was on probation at the time and she knew he could not hit her back without serious consequences. (*See* N.T. – Jury Trial at 102, 1/19/17; N.T. – Jury Trial at 53-54, 1/20/17.)

---

[2] While the Bill of Information reflects the underlying incident occurred on November 20, 2015, the Commonwealth made an oral pre-trial motion on the first day of trial to amend same to November 19, 2015, to which trial counsel, Evan Hughes, Esquire, did not object and the trial court granted. (*See* N.T. – Jury Trial at 10, 1/19/17.)

[3] William Neely, Jr., Defendant's fiancé at the time of trial, testified as to A.K.'s brother's height and weight, saying the brother was larger than he in both height and weight, which was 6'3" and 250 pounds, respectively. (*See* N.T. – Jury Trial at 29-30, 1/20/17.)

2

Two (2) days after the stabbing, on November 19, 2015, A.K. was suspended from school and required to leave early because A.K. allegedly threatened another student at school after this student, who happened to be present when A.K. had stabbed her brother, was talking to others about the incident, claiming A.K. not only stabbed her brother but tried to stab her, too. (*See* N.T. – Jury Trial at 44, 66-67, 105-06, 1/19/17.) The underlying Defendant, A.K.'s mother, was then forced to leave from work early[4] in order to pick A.K. up from school and drive her home. (*Id.* at 45, 60-61; N.T. – Jury Trial at 35, 1/20/17.) According to A.K., when she and the underlying Defendant arrived home, Defendant instructed A.K. to enter the door, after which it was locked by Defendant and A.K. "ended up on the floor." (*See* N.T. – Jury Trial at 45, 1/19/17.) Defendant testified that she began to hit A.K. to punish her. (*See* N.T. – Jury Trial at 40, 1/20/17.) A.K. testified that when the door closed, Defendant began to kick and punch her numerous times, resulting in bruises on her legs, backside, and face.[5] (*See* N.T. – Jury Trial at 46-47, 50, 1/19/17.) Eventually, the hitting ceased and A.K. went to her room where she cried herself to sleep. (*Id.* at 48-49.)

The following morning around 11:00 A.M., on November 20, 2015, the Upper Moreland Police Department responded to Defendant's residence at Jamestown Village Apartments, 2501 Maryland Road, Apartment C-5, Willow Grove, Pennsylvania, in order to investigate the stabbing that occurred three (3) days prior on November 17, 2015, the suspect of which was Defendant's daughter, A.K., the alleged victim in the instant matter. (*Id.* at 51, 75, 77-80, 93-94.) Said investigation began after a school official from one of Defendant's children's schools provided the tip to law enforcement. (*Id.* at 90.) Upon the officers' arrival, Defendant answered the door, informing them that A.K. was home from school on

---

[4] Defendant was working many hours with her two (2) jobs during the time of the incident and was a bar manager with more responsibility. Mr. Hughes solicited testimony from the Defendant that she told the principal of A.K.'s school that she was not coming to pick her up. (*See* N.T. – Jury Trial at 35, 44-61, 1/20/17.) Mr. Hughes did so without any explanation that Defendant worked a lot, approximately sixty (60) hours a week, with at least one (1) position as a bar manager, which typically does not come with the benefit of being able to leave on a moment's notice. (*See* N.T. – Jury Trial at 43, 1/19/17.)

[5] A.K. claimed Defendant punched her twenty (20) times and kicked her five (5) times within a period of "five minutes, maybe less than that". (N.T. – Jury Trial at 46-47, 64, 1/19/17.) However, A.K. admitted on cross-examination these were estimates and that she did not know how she came to the estimates, but noted "she talked to the police". (*Id.* at 66.)

3

suspension and presently inside the apartment. (*Id.* at 80-81.) The responding officers then asked Defendant permission to speak with A.K. in reference to the November 17, 2015, stabbing incident, which Defendant declined at that time and commented to law enforcement that, "When you see what I did to her, you will arrest me." (*Id.* at 81, 94-95.) Due to that statement, the officers forced entry into Defendant's home in order to ensure A.K.'s well-being. (*Id.* at 81-82, 112-13.) Thereafter, the officers found A.K. coming out of her bedroom, bruised, and noticed she suffered an injury to her left eye, which was also bruised around the entirety of the eye and slightly closed from swelling. (*Id.* at 82, 85.) The officers inquired to A.K. about the cause of the condition of her left eye, to which she responded that her mother punched her. (*Id.* at 52, 82-83.) Defendant was placed under arrest for suspected assault on A.K., and both were transported to the local police station for questioning. (*Id.* at 83, 109-10.) Defendant, at that time, permitted the questioning of her daughter, A.K. (*Id.* at 97.)[6]

After the incident, A.K. was taken from her home to live with her grandparents. (*Id.* at 71.) A.K. made multiple attempts at running away from her grandparents. (*Id.*) A.K. testified at trial that she told her mother that she wanted to come back home many times after the occurrence, and in fact, when she ran away from her grandparents' house, she ended up back with her mother before being brought to the police station by her mother,. (*Id.* at 64, 69-71.)[7] As a result of her refusal to stay in her grandparents' home, A.K. was sent to [secure] detention, and [she] ended up going to the group home." (*Id.* at 15-16, 40, 58, 63-64, 68, 70.)

Evidence of defense counsel's unpreparedness began with his first contact with the trial court on Monday, January 19, 2017, the day the two (2)-day jury trial in this matter commenced, as he had not entered his appearance, requested a continuance after the close of business the preceding Friday, and

---

[6] The defense of this case should have been limited to the facts as stated thus far—the facts of the day in question, the investigation thereafter, and whether Defendant's actions permitted by way of corporal punishment, or were excessive and rising to the level of criminal action.
[7] Mother took A.K. to the police when she arrived at her home, as there was a no-contact order in place due to the current incident. (*Id.* at 64, 69-71.)

4

appeared late and unprepared in court each day. (*See* N.T. – Jury Trial at 3-14, 18-19, 24-27, 1/19/17.)

Portions of the record from the first day of trial that are relevant to this Opinion are as follows:

THE COURT: You are Mr. Hughes?

MR. HUGHES: Good Morning, Your Honor.

THE COURT: We were scheduled to start at 9:00 o'clock this morning. It is now 10:00 o'clock. I understand you called a 9:15, saying you were stuck in traffic.

MR. HUGHES: Mile marker 356 there was an accident.

THE COURT: The first issue we have to deal with is representation. As of today – as of yesterday, Miss Schanbacher from the Public Defender's Office was counsel of record. We did receive an e-mail on the 17th at 5:50 p.m. from Mr. Hughes asking for a continuance in this matter, saying he was just recently retained. That request was denied, as this matter has been scheduled since November 16. It has been over two months that this matter has been scheduled, and this [c]ourt does not continue matters absent emergency circumstances, true emergencies. Someone dying would be a true emergency.

At this point, we have Miss Schanbacher, who is ready to proceed, and we have Mr. Hughes who has entered his appearance today.

Mr. Hughes, are you able to enter your appearance if you are ready to proceed to trial today? That is the only way the [c]ourt will accept your entry.

MR. HUGHES: Yes, Your Honor. I am prepared to move forward to trial. I did attempt to enter my appearance. Twice it was rejected –

THE COURT: If you are ready to proceed.

MR. HUGHES: -- for not having original signature. We are ready to proceed. I would like to inform the [c]ourt, if the [c]ourt would entertain this, counsel and I spoke last evening regarding this matter. There is a high probability – I shouldn't say that, but there is, I belie, a very good probability that this could resolve in non-trial. I had my client fill out an ARD application that had not been in the discussions involving prior counsel.

THE COURT: If ARD is approved[,] today will be the only day, as in this morning. We have a jury panel waiting, and it will not be continued. It's been scheduled for two months. That is the only way the [c]ourt will consider it.

[COMM'W]: Absolutely. I just wanted to let Your Honor know that I did express that it would have to go through someone else. I will be happy to talk to someone upstairs.

THE COURT: We do have 41 people waiting. The paperwork I being brought down to the two of you any moment to review.

5

So if you want to hand [Commonwealth] your ARD application and, counsel, you can choose to walk it upstairs, that's fine, but if that does not get accepted this morning, as in the next half an hour, because I am not going to have the jury wait, not have 41 people wait because this is filed in the last moment. We will be proceeding with jury selection. I will not – so you are both aware, my jury selection typically takes an hour and a half. I will take a lunch break, and we won't swear in the jury until after lunch. So if something happens between now and by the time we get back from lunch and swear a jury, I have no objection to this defendant being placed in ARD, if that's what your office approves.

[COMM'W]: Right.

THE COURT: We are not putting off the trial.

[COMM'W.]: Thank you, Your Honor. I would just ask that we be given the surveys at the time same time.

THE COURT: You are being given it at the same time.

[COMM'W.]: Additionally, Your Honor, I do have one pretrial motion.

THE COURT: Before we get to that, so at this time, since Mr. Hughes is prepared to proceed with trial today, we will remove Miss [Schanbacher] and I will sign her motion to withdraw as counsel. I appreciate your continuing to be ready for trial. You can get ready for next week's 30 cases you have on Monday.

MS. SCHANBACHER: Excellent, Judge.

THE COURT: Make a copy for everybody.

MS. SCHANBACHER: I did not want to put on the record that because there was no final determination as to how, understanding with the [c]ourt until this morning, I received an e-mail approximately 8:00 o'clock last night from [Commonwealth] containing some additional discovery I was able to only review this morning. In my review, it appears to contain some [B]rady information and disclosures that I would have appreciated earlier in the process. I don't know if the same information was provided to current counsel. So I wanted to place on the record that it was received after hours last night, reviewed this morning, and I just wanted to insure [sic] that counsel himself also has a copy.

THE COURT: Have you received the information last night?

MR. HUGHES: I did not notice any new information last night.

[COMM'W.]: I did send that over, Your Honor.

MR HUGHES: I didn't check my email this morning.

MS. SCHANBACHER: I will be happy to hand him my firm copy right now. I wanted to place all of that on the record.

THE COURT: [Commonwealth], why at 8:00 o'clock the night before trial are we handing over documents?

[COMM'W.]: That was given in an abundance of caution. It is not the police report that is associated specifically with that case. I did see that

6

there was a mention of this case, so I sent that over. I will be honest, You Honor, I was confused as to which attorney was of record.

THE COURT: Regardless of which attorney, 8:00 o'clock last night.

[COMM'W.]: I understand, Your Honor, but I wanted to let you know that that was also an issue in terms of trying to figure out who I was sending discovery to and who I was discussing this case with. I do apologize for the late notice of that, and I did hand it over in an abundance of caution.

THE COURT: Miss Schanbacher, you are excused.

MS. SCHANBACHER: Thank you, Judge.

> *[As noted below, Mr. Hughes objected to questioning the jury panel with specific voir dire questions regarding corporal punishment.]*

THE COURT: Will either party be utilizing the ability of a parent to use corporal punishment in Pennsylvania as an issue in this case?

MR. HUGHES: Absolutely.

THE COURT: I figured. So I am prepared and will listen to any request to amend or for additional voir dire questions to try to flush out for the two of your jurors who may have a predisposition one way or the other. I have added two additional voir dire questions: Do any of you believe it is always acceptable for a parent to use physical force as a method of punishing a child, and do any of you believe it is never acceptable for a parent to use physical force as a method of punishing a child, as two additional voir dire questions are in addition to the standard questions that are given.

Any objection to these questions?

[COMM'W.]: No, Your Honor.

THE COURT: Mr. Hughes? I will state for the record, the [c]ourt's intention is, it gives both of you a sense of people who are in extreme categories one way or the other as it relates to it.

MR. HUGHES: I believe it is the law of the land, and I don't believe – I am not requesting voir dire instruction if the [c]ourt feels it's necessary. We are not requesting that. I don't believe it's necessary.

THE COURT: Well, the law of the land is that corporal punishment is permitted, but to a certain extent, and if a parent goes over the line that exists, and it's been established more by case law than by statute, then that is no longer permissible. So that is a nuance that I think is difficult to discern from general voir dire.

So you are not requesting any questions as relates to corporal punishment?

MR. HUGHES: No. I believe that nuance is something that will be addressed throughout the case on closing arguments, and I don't believe the nuance is clarified with the voir dire question. It just is – it doesn't really speak to that. We are not requesting it.

7

THE COURT: Commonwealth?

[COMM'W.]: Your Honor, I would ask that those questions be admitted as you stated. The general voir dire questions really don't get to any unfair or impartial mindset that a potential juror could have in a case like this. And, again, the fact that it's asking for never and always acceptable, I think it's fair to both parties.

THE COURT: The [c]ourt will include these two voir dire questions. Are there any additional requests for voir dire questions outside of the standard?

MR. HUGHES: If those voir dire questions are – if the questions are going to be asked, I would request that a question that asks, do you agree, or if the [c]ourt instructs you, that corporal punishment is legal, unless it crosses – the language is escaping right now, but unless it crosses a certain line, would you be able to follow the [c]ourt's instruction, that is the law, that I believe would be a more appropriate inquiry, and that was not – that was disartfully presented.

THE COURT: I understand what you are looking for. Okay. So I can work on that while you two are seeing that ARD is an option in this case.

[...]

*[The trial court recessed, reconvening again at 10:50 A.M.]*

THE COURT: We took a recess so [Commonwealth] could speak with her office. It's my understanding ARD will not be approved in this case.

[COMM'W.]: That's correct, Your Honor. Mr. Antonaccio, the captain of ARD, did come down and speak personally with defense counsel in this matter and he did deny ARD.

THE COURT: All right. There was a request from Mr. Hughes to have an additional instruction regarding the law of corporal punishment here in Pennsylvania. I have marked and prepared as Judicial Exhibit 2 and handed a copy to counsel. You can each review that and let me know if you have any objections or requested amendments.

[...]

MR. HUGHES: This is acceptable to defense, Your Honor. Thank you.

THE COURT: Commonwealth?

[COMM'W.]: I have no objection, Your Honor.

THE COURT: After I ask the first two questions that I referenced earlier about the always and never for the use of physical force, I will add this. Anything else we need to address before we bring the jury in?

[...]

(N.T. – Jury Trial at 3-14, 18-19, 24-27, 1/19/17.) The trial court conducted *voir dire* of the prospective jurors, greeted the selected jurors, and took a recess for lunch before giving the preliminary charge to the jury. As the jury was about to enter the courtroom to begin the trial, Mr. Hughes raised a Motion to

8

Suppress that he wished to address. (*See* N.T. – Jury Trial at 3-14, 18-19, 24-27, 1/19/17.) Said motion was not filed or otherwise presented timely in accordance with Pa. R.C.P. 577, 578, 581, and its untimeliness provided further evidence that defense counsel was unfamiliar with the discovery provided.

> [...]
>
> MR. HUGHES: There is one issue.
>
> THE COURT: Tell [the jury] to wait.
>
> MR. HUGHES: In the incident form that I have here, there is mention of a statement that my client makes to police upon their entry into my client's home. I was just provided with, and this may have been discovery, this Miranda waiver for the Miranda waiver. It's subsequent to these incriminating statements. I would ask the [c]ourt's permission to make an oral motion to suppress. If the [c]ourt allows it, it would be quite brief. It's regarding one incriminating statement.
>
> THE COURT: We started this. It's now almost five minutes after 2:00. We have done jury selection. The jury is ready to come out for opening statements. The [c]ourt will not permit that at this time.
>
> What I will do is instruct everyone that you shall not open on any statements that were given or this particular statement that was given, and we will address that at the conclusion of the testimony today before the officer is called.
>
> [COMM'W.]: You Honor, if I may, I do object to any sort of motion to suppress at this point. Additionally, and more importantly, I do not see any issue of suppression. There was a statement. If it's the statement I understand that Mr. Hughes is talking about, this was a statement that she uttered in her own home.
>
> THE COURT: Just because she uttered in her own home doesn't mean you are not in custody. There are other components. Whether or not you are in your own home, just because you, as the Commonwealth, doesn't see it as an issue doesn't mean it's not really an issue.
>
> [COMM'W.]: I understand your position, Your Honor. But, again, mainly the fact that the opportunity for the defense attorney to bring forward a motion to suppress has come and gone and –
>
> THE COURT: It has come and gone.
>
> [COMM'W.]: And, frankly, this is a significant portion of the case that I do have listed in my opening, and I don't think that – since we shouldn't have a suppression motion because of the lateness and the timeliness and the fact that I have no specificity or particularity as to what suppression motion is even based on.
>
> THE COURT: When was the Miranda statement, this Miranda statement that's referenced by counsel, provided.
>
> [COMM'W.]: That was provided when she was at the station, when she –

9

THE COURT: No, no. When was the document itself provided? Is it one of the documents provided last night at 8:00 o'clock?

[COMM'W.]: This was in discovery when it was originally sent to Miss Schanbacher probably at the last PTC listing.

THE COURT: Based on that, the [c]ourt will modify. Your request to file motion [sic] to suppress at this time is denied. We will go forward.

*[The jury entered and the trial court commenced trial with a greeting and preliminary instructions before counsels' opening statements.]*

(N.T. – Jury Trial at 3-14, 18-19, 24-27, 1/19/17.)

Portions of the record from the second day of trial are also relevant to the instant appeal, specifically as to Mr. Hughes' repeated lateness for trial, as follows:

THE COURT: Mr. Hughes, what is today's excuse?

MR. HUGHES: No excuse, Your Honor. I'm sorry.

THE COURT: It is absolutely unacceptable. When the jury is deliberating, we will discuss whether or not we will have contempt proceedings. I ordered you to be here at 9:15 so the jury can start promptly by 9:30. You are walking in here at 9:50. It is disrespectful to the [c]ourt. This is your second day being late. And while yesterday could have been understood because the accident, today is not.

Before we bring the jury out, so we don't have to waist [sic] more of their time, the [c]ourt gave everyone its list of the charges that it intends to give. Commonwealth this morning provided the [c]ourt with suggested jury instructions.

[...]

*[Before bringing the jury back out, the trial court discussed the concluding jury charges, i.e., credibility of defendant as a witness and corporal punishment, and then swore in the Defendant, qualifying her to ensure she was knowingly and voluntarily waiving her right to not testify.]*

(N.T. – Jury Trial at 4-13, 1/20/17.)

Following the jury trial, Defendant filed, *pro se*, her Post-Trial Motion despite still being represented by Mr. Hughes after he refused to file post-trial motions without additional compensation. (*See* "Post-Sentence Motion Pursuant to Pa. R. Crim. P. 720", 6/15/17.) Due to Mr. Hughes' refusal to continue trial representation of Defendant through post-trial motions despite the trial court's instruction

10

that such was his obligation[8], the trial court ultimately appointed new counsel, Dennis Caglia, Esquire, to represent Defendant on said Post-Trial Motion, which was denied after conferencing with counsel for the Commonwealth and the Defense and after the trial court granted unitary review of Defendant's claim for ineffective assistance of trial counsel. (*See* "Order", 9/26/17; N.T. – "PCRA Hr'g", 12/19/17.) In order to effectuate unitary review, Defendant was first asked to review and sign a Waiver of Subsequent PCRA Rights. (*Id.* at 8.) At the Hearing for unitary review, it was established that Defendant retained Evan Hughes, Esquire, for $3,500.00 in or around December of 2015, prior to Defendant's preliminary hearing. (*Id.* at 12.) Defendant met with Mr. Hughes at least twice before said preliminary hearing. (*Id.* at 13.) Despite having been paid a retainer and being expected by Defendant to represent her, Mr. Hughes failed to appear at the first preliminary hearing date, and also failed to call Defendant to inform her of his reasons for not appearing. (*Id.*) To Defendant's surprise, she was informed by the preliminary hearing judge that Mr. Hughes asked for a continuance, and the matter was continued to January 27, 2016. (*Id.*)

On January 27, 2016, Mr. Hughes failed to appear again for a preliminary hearing and failed to notify Defendant of same. (*Id.* at 14.) Mr. Hughes also failed to answer the phone when Defendant called at the time of said preliminary hearing. (*Id.*) Again, the preliminary hearing had to be continued, and again, for a third time, Mr. Hughes failed to appear. (*Id.*) It was not until March of 2016, that Defendant actually had her preliminary hearing, at which Defendant was met for the first time by one (1) of Mr. Hughes' colleagues, despite having retained him in 2015. (*Id.*) After said preliminary hearing, Defendant contacted Mr. Hughes over the phone in order to obtain the preliminary hearing transcript with the hope that same would be useful for trial preparation, particularly after a representation was made by Mr. Hughes' colleague to Defendant about a future motion to suppress based upon the testimony at the preliminary hearing. (*Id.* at 15-16.) Mr. Hughes responded that he was no longer Defendant's counsel but could give a call to Liberty Reporting (the company of the court reporter for the magisterial district

---

[8] (*See also* email correspondence from Robert Oliver to Evan Hughes, 7/11/17.)

11

court), and then hung up the phone. (*Id.* at 15.) He further recommended she apply to the Public Defender's Office in order to become eligible for court-appointed counsel. (*Id.* at 17.)

Defendant subsequently obtained representation through Assistant Public Defender ("APD"), Megan Schanbacher, Esquire, who appeared on time for the first day of trial on January 19, 2017, and was prepared to proceed. (*See* N.T. – Jury Trial at 4, 1/19/17.) However, unbeknownst to Defendant and just days before trial was scheduled to commence, her then-fiancé, William Neely, had retained Mr. Hughes for another $5,000.00 total in order to represent her at trial. (*See* N.T. – "PCRA Hr'g" at 17-18.) Mr. Neely paid Mr. Hughes' in two (2) installments—one installment of $2,000.00 on January 12, 2017, seven (7) days prior to trial, and a second installment of the remaining $3,000.00 on or around January 16, 2017, three (3) days prior to trial. (*Id.* at 17-18, 47.) Despite accepting payment Mr. Hughes did not enter his appearance and without said entry made an informal, e-mail request for a continuance the Friday before trial was to commence, January 17, 2017, at 5:50 P.M., well after the trial court's close of business. (*See* N.T. – Jury Trial at 3, 1/19/17.) Given the trial was scheduled two (2) months' prior on November 16, 2017, and Mr. Hughes failed to argue any emergency circumstances, the trial court denied his request for a continuance. (*Id.*) Appointed counsel on unitary review, Dennis Caglia, suggested in his argument to the trial court the following, logical reason for Mr. Hughes' seeming unpreparedness and request for a continuance:

> Part of the fee paid January 13, January 12, whenever it was, but that's when the little flurry of activity occurred. The e-mail to [A.P.D.] Schanbacher, the discovery, and the nothing else. And I submit nothing else, logical inference was because he didn't have the rest of his money. He gets the rest of his money couple days before trial, now he is a whirlwind of activity.

(*See* N.T. – "PCRA Hr'g" at 47.) Defendant also did not receive any letter or confirmation in writing from Mr. Hughes after the final trial retainer was paid. (*Id.* at 18.) Defendant explained that she had only met with Mr. Hughes once or twice during the preliminary hearing stage of this matter, and did not meet Mr. Hughes again until the day trial was scheduled to commence. (*Id.* at 19.) After trial, Defendant was unable to reach Mr. Hughes, and the only information she really received was that she did not retain him

12

for post-trial motions. (*Id.* at 20.) In fact, Mr. Hughes requested and required an additional $1,500.00 in order to assist her with her post-trial motion, despite knowing that she only had ten (10) days after Sentencing to timely file same and that he remained counsel of record. (*Id.* at 20, 29-30.)

Mr. Hughes failed to discuss trial strategy and to meaningfully attempt to prepare with Defendant prior to trial. For example, Mr. Hughes only met once with Defendant for approximately fifteen (15) minutes, at which time he had discussed prior OCY investigations into Defendant, noting to her that it would be important to know the details because the Commonwealth would probably raise the issue. (*Id.* at 21-22, 32.) Furthermore, Defendant had no prior record; whereas, A.K. had a substantial history with juvenile delinquency and dependency. (*See, generally, id.*) Despite this and Defendant having good character, Mr. Hughes failed to discuss character witnesses with her until a day or two before trial, and that was only had over the telephone. (*Id.* at 26-27.) At no time did Mr. Hughes ask for contacts of these proposed character witnesses, nor did the two discuss the testimony of said individuals. (*Id.* at 27, 29, 65-66.) In addition, Mr. Hughes did not want to have Defendant's son, who was stabbed by A.K., to testify as to his fear of A.K. and her bullying of him, because he had a felony charge against him, which, according to Mr. Hughes, would have made him look bad and would have been unhelpful to Defendant. (*Id.* at 29.) Mr. Hughes also failed to go over with Defendant the accusations against her; the discovery, including the police paperwork; and Alternate Dispute Resolution ("ARD"). (*Id.* at 25, 33; *see also* N.T. – Jury Trial at 4-6, 1/19/17.) In fact, the only conversation Mr. Hughes had with Defendant with respect to ARD was at the time of trial. (*See* N.T. – Jury Trial at 4-6, 1/19/17.)

With regard to trial strategy, the only conversation that Defendant could recall was one during the preliminary hearing stage in which Mr. Hughes discussed the potential for a motion to suppress of the statements that came after the police entered Defendant's home, on the basis that such was warrantless, illegal, and anything coming thereafter, fruit of the poisonous tree. (*Id.* at 27-28.) Mr. Hughes apparently represented to Defendant that she would not see a day in court. (*Id.* at 28.) However, Mr. Hughes failed to file such a pre-trial motion, instead making a late oral motion when trial was commencing. (N.T. –

13

Jury Trial at 24-25, 1/19/18.) Otherwise, Defendant and Mr. Hughes never discussed trial strategy. (N.T. – "PCRA Hr'g" at 28.) A.K. had a history of incorrigible behavior and was repeatedly placed in juvenile delinquency and dependency placements, which should have been a focal point of the defense in bolstering the claim of necessary corporal punishment. (*See, e.g.,* N.T. – Jury Trial at 15-16, 40, 58, 63-64, 68, 70.) Apparently, a comment by Mr. Hughes to Defendant that can be construed as somewhat of a strategic move was that he would not "beat up" A.K. on the stand during cross-examination because "it would look bad if a man berated a young girl on the stand, especially after everything she has been through." (*Id.*) The record clearly establishes this lack of strategy by Mr. Hughes, *i.e.*, his introduction of details of the prior OCY/CYS investigations that were not elicited by the Commonwealth; of A.K.'s fear of her mother when disciplined; and of A.K.'s "extreme pain" she felt following the incident. (*See, generally,* N.T. – Jury Trial 1/19/17-1/20/17; *see also, generally,* N.T. – "PCRA Hr'g".)

## PROCEDURAL HISTORY

On March 25, 2016, the Criminal Complaint and Affidavit of Probable Cause were filed against Appellant. (*See* "Police Criminal Complaint", 3/25/16.)

On April 29, 2016, Appellant filed the Bills of Information, wherein the underlying Defendant was specifically charged with three (3) separate criminal counts relating to Title 18 Pennsylvania Consolidated Statutes (Pa. C.S.), Sections (§§) 2701 (*i.e.*, Count 1: Simple Assault); 4304 (*i.e.*, Count 2: Endangering the Welfare of a Child ("EWOC")); and 2709 (*i.e.*, Count 3: Harassment). (*See* "Bill of Information", 4/29/16.)

On November 16, 2016, the trial court scheduled a two (2)-day jury trial to commence approximately two (2) months later, on Tuesday, January 19, 2017, and to conclude on Wednesday, January 20, 2017. (*See* "Call of the Trial List Order", 11/16/17.) Prior to the commencement of trial, APD, Megan Schanbacher, Esquire, represented the underlying Defendant and was prepared to proceed to trial. (*See* "Entry of Appearance", 6/6/16.) However, days before trial and unbeknownst to Defendant, her then-fiancé, William Neely, retained Evan Hughes, Esquire, to represent her at trial. (*See* N.T. –

14

"PCRA Hr'g" at 17-18.) Despite the trial being scheduled to commence at 9:00 A.M., Mr. Hughes arrived at 10:00 A.M., at which time the trial court noted Mr. Hughes sent an e-mail to its chambers at 5:50 P.M., well after the close of business, the preceding Friday before trial, wherein he indicated was just recently retained by the underlying Defendant; requested a continuance of the trial; and noted he had entered his appearance on behalf of same. (*See* N.T. – Jury Trial at 3-4, 1/19/17; *see also* "Entry of Appearance", *dated* 1/12/17, *filed* 1/30/17.) However, upon the trial court's review of the docket, Mr. Hughes had failed to successfully file his entry of appearance at that time, but nevertheless was permitted to enter his appearance on the record in open court only after he represented to the undersigned that he was prepared for trial. (*See* N.T. – Jury Trial at 4, 1/19/17.)

Upon the conclusion of trial, Defendant was found guilty by the jury of Counts 1 and 2, while Count 3 was held to be addressed by the trial court during sentencing. (*See* "Trial/Plea/Sentence", 1/20/17.) On June 5, 2017, sentencing was held, at which time Defendant was sentenced to the following upon consideration of the Pre-Sentence Investigation ("PSI") and Report that was submitted: On Count 1, Simple Assault, probation for one (1) year to commence on June 5, 2017 and to pay costs of prosecution; on Count 2, EWOC, one (1) year probation concurrent to Count 1 plus costs of prosecution; and on Count 3, Harassment, the undersigned found the underlying Defendant not guilty. (*See* "Trial/Plea/Sentence", 6/5/17.)

On June 15, 2017, Defendant filed timely, *pro se* Post-Sentence Motions in Arrest of Judgment; for a New Trial; and to Modify Sentence, despite still being represented by privately-retained counsel, Evan Hughes, Esquire. (*See* "Post-Sentence Motion Pursuant to Pa. R. Crim. P. 720", 6/15/17; *see also* N.T. – "PCRA Hr'g" at 4, 12/19/17.) On July 11, 2017, the undersigned's law clerk reached out to Mr. Hughes, informing him that he still represented Defendant and she had filed her *pro se* Post-Sentence Motions; and inquiring whether he would be filing any supplement to her *pro se* form-filing.[9] (*See* N.T. – "PCRA Hr'g" at 4.) On the same day, Mr. Hughes replied that Defendant "did not retain [him] for post

---

[9] (*See* email correspondence from Robert Oliver to Evan Hughes, 7/11/17.)

15

trial motions or appeal[,]" and further asked, "if the filing of a motion to withdraw is necessary.[10]" (*Id.*) On the same day, the undersigned's law clerk replied, informing Mr. Hughes that representation continues through post-sentence motions unless a motion for leave to withdraw appearance is filed with and granted by the trial court.[11] (*Id.*) Due to Mr. Hughes' lack of response thereto, on July 25, 2017, the undersigned's law clerk again reached out to Mr. Hughes and forwarded the previous email informing him that he was still representing Defendant.[12] Not having heard any response again by Mr. Hughes, the trial court scheduled a hearing for September 15, 2017, in order to determine "whether Defendant intends to seek new counsel to represent her on her post-sentence motions; whether Defendant has applied for representation from the Montgomery County Public Defender's Office; or whether Defendant voluntarily, knowingly, and intelligently seeks to waive her right to defense counsel and to represent herself, *pro se*, on her post-sentence motions. (*See* "Scheduling Order", 8/23/17; *see also* N.T. – "PCRA Hr'g" at 4-5, 12/19/17.[13]) Almost one (1) month after emailing Mr. Hughes, on August 25, 2017, he replied via e-mail with an attached motion to withdraw, and alleged same was "out for filing".[14] On August 29, 2017, said motion to withdraw was docketed. (*See* "Motion for Leave to Withdraw Entry of Appearance", 8/29/17.)

On September 5, 2017, in order to promote the administration of justice in this criminal matter, the trial court withdrew Mr. Hughes as defense counsel of record. (*See* "Order", 9/5/17.)

On September 15, 2017, after the hearing to determine whether Defendant desired new defense counsel, the trial court found she qualified for, and desired, court-appointed counsel to represent her on her petition for unitary review. (*See* "Order", 9/15/17.) On September 26, 2017, due to a conflict with the Public Defender's Office of Montgomery County, the trial court appointed private counsel, Dennis Caglia, Esquire, to represent the underlying Defendant. (*See* "Order", 9/26/17.)

---

[10] (*See* email correspondence from Evan Hughes to Robert Oliver, 7/11/17.)
[11] (*See* email correspondence from Robert Oliver to Evan Hughes, 7/11/17.)
[12] (*See* email correspondence from Robert Oliver to Evan Hughes, 7/11/17.)

[13] The trial court notes that defense counsel of record, Evan Hughes, was copied on said Order and was required to appear for the September 15, 2017, Hearing unless otherwise permitted to withdraw.
[14] (*See* email correspondence from Evan Hughes to Robert Oliver, 8/25/17.)

16

On October 11, 2017, after a conference was held with both counsel, the Defense and Appellant (Commonwealth) filed a joint motion to request an extension of time with regard to post-trial motions. (*See* "Joint Motion for 30 Day Extension of Time to File Supplemental Post-Trial Motions", 10/11/17.) Said joint request for an extension was granted on October 13, 2017. (*See* "Order", 10/13/17.) On October 23, 2017, the underlying Defendant filed her Supplemental Post-Sentence Motion, wherein the Defense clearly outlined several claims for ineffective assistance of trial counsel, Evan Hughes. (*See* "Supplemental Post-Sentence Motion and Request for Unitary Relief", 10/23/17.) The following day, on October 24, 2017, the trial court held a telephone conference with both counsel, after which an order was issued on October 26, 2017, providing Appellant with thirty (30) days to respond to the Defense's Supplemental Post-Sentence Motion and Request for Unitary Relief; and further, scheduling a Hearing on said Defense Motion for December 19, 2017. (*See* "Order", 10/26/17.) On November 13, 2017, Appellant filed its Answer. (*See* "Commonwealth's Answer to Defendant's Supplemental Post Sentence Motion and Request for Unitary Relief", 11/13/17.)

On December 19, 2017, a hearing was held on Defendant's Post-Trial Motions, at which the undersigned denied same, but granted the defense request for unitary review with respect to the effectiveness of former trial counsel, Evan Hughes, and after which the trial court's ruling was entered on the record. (*See* N.T. – "PCRA Hr'g" at 4-7, 12/19/17.) Notably, Mr. Hughes was subpoenaed by the Commonwealth to appear as a witness at said hearing; however, he did not appear and did not warn the Commonwealth of his unavailability. (*Id.* at 35-37, 69-75.) The record from the December 19 Hearing reflects as much:

> THE COURT: Mr. Hughes did contact the [c]ourt on Friday, the 15th of December after the close of business, notifying [the undersigned's] law clerk that he would be unable to appear today, as he had to be in court in Connecticut for a matter, but, [Commonwealth], it's not my understanding he ever contacted you with that information?
>
> [COMM'W.]: That is correct, Your Honor. I called Mr. Hughes, and I left a voice mail for him, and he did not return my call, Your Honor.
>
> THE COURT: So, [Commonwealth], I will just state on the record, if you feel you need Mr. Hughes, I will give the Commonwealth a

17

continuance to enable you to have him come in and we can reschedule. We can bifurcate this and have this continued the first week in January to give you sufficient time to subpoena Mr. Hughes. But that is up to you if you feel you need him or not.

[COMM'W.]: Thank you, Your Honor. I would like to revisit that issue after argument.

THE COURT: You have to figure that out before argument.

[COMM'W.]: It's something that – you are asking me to figure it out before argument?

THE COURT: Because if the argument is –

[COMM'W.]: Well, maybe I can help you, Your Honor.

THE COURT: Sure.

[COMM'W.]: Part of my argument will be that, in order to sustain defendant's burden of proof, defendant is going to need to have counsel address what his strategy, if he had a reasonable basis for his actions or inaction. Then everything else becomes irrelevant. So we wouldn't move to dismiss or ask for the [c]ourt to find no relief based on that argument, Your Honor.

THE COURT: That's your position before we go – we can start with that, and that's fine.

So regarding the standard for this [c]ourt to review, there are three factors, and it sounds like the Commonwealth is requesting the [c]ourt will be fine with that going to the first two. The first is whether or not the claim is of arguable merit, and the second is that counsel had no reasonable strategic basis for [his] actions or inaction.

So if we would like to start with that.

(*Id.* at 36-37.) Counsel for both parties then went on to argue, respectively. A notable aspect of Mr.

Caglia's argument that Mr. Hughes was ineffective is as follows:

Mr. Hughes totally, totally obliterated the best argument, that my client was a woman who was severely stressed out, financial stresses, whatever other stresses were in her life, raising three children, two boys, a girl, trying to do the best, and her daughter is going haywire. She is in placement with OCY. It's in the record. She was a run away. She stabbed her brother the day before. She threatened the child at school. All these are references I make, factually are in the transcripts, they are in the record. This is the logical argument I submit should have been made that was obliterated by Mr. Hughes.

Here is a mother, who is just trying to do the right thing, and then at the last minute, there is this attitude, she doesn't want to pick her daughter up, she just can't deal with it, and she just loses it. That's the argument he should have made. Should have had – anyone who had a child should be on that jury, the older the better, but that's not – that doesn't make him

18

ineffective. That's what he should have been arguing, because a parent would know at some point, you reached the end of your limit, and God help you. He destroyed that.

(*Id.* at 45-46.) Mr. Caglia made several arguments for ineffective assistance, including that the cumulative effect of all Mr. Hughes' errors amounts to ineffective assistance of counsel. (*Id.* at 45-56.) The Commonwealth, on the other hand, generally argued that the defense failed to meet is burden under the PCRA and that there is the presumption under the law that counsel is effective. (*Id.* at 56-67.) The Commonwealth then went on to clearly outline the eight (8) claims of ineffective assistance of counsel that was put forth by the defense in its supplemental post-sentence motion:

1. Failure to identify alleged *Brady* material;
2. Failure to research and submit proposed *voir dire* and jury points for charge;
3. Failure to file a pre-trial motion to suppress Mirandized statement;
4. Failure to raise history of A.K.'s delinquency on cross-examination;
5. Cross-examination by Defense Counsel and his introduction of CYS/OCY;
6. Failure to interview character witnesses prior to trial;
7. Direct examination of Defendant by Defense Counsel and raising CYS/OCY involvement; and
8. Failure to file any post-sentence motion(s).

(*Id.*)

As to issue 1, *failure to identify alleged Brady material,* the Commonwealth argued there was no prejudice to Defendant because Megan Schanbacher, the APD assigned to this case prior to Mr. Hughes' entry of appearance, did not allege there was *Brady* material on the first day of trial, rather that there "might be *Brady* material." (*Id.* at 59.) The Commonwealth then went on to argue the following:

[COMM'W.]: It's the defendant's responsibility to come in here today, if there was any Brady material, and tell us what that Brady material was. Because if there was Brady material that was missed, then the Commonwealth has no argument, but if there was no Brady material, then there is no prejudice if the counsel didn't miss or fail to present Brady material that didn't exist.

(*Id.*)

19

As to issue 2, *failure to research and submit proposed voir dire and jury points for charge,* the Commonwealth argued lack of prejudice to Defendant because even if such failure amounts ineffective assistance of counsel, the trial court ultimately did conduct *voir* dire and give a point for charge, both relating to use of corporal punishment. (*Id.* at 59-61.) Moreover, the Commonwealth argued that there was a lack of prejudice because the Defense failed to specify what points for charge could or should have been proposed by Mr. Hughes'. (*Id.* at 61.)

As to issue 3, *failure to be aware of and prepare for the Defendant's Mirandized Statement,* specifically failure to file a formal pretrial motion for suppression as opposed to a late oral motion on the record on the first day of trial as the jury panel was ready to come into the courtroom; the Commonwealth again argued lack of prejudice. (*Id.*) The Commonwealth contended that under the PCRA, the Defendant must show underlying merit to the suppression issue, and since no merit can be shown or argued by the Defense, there is a lack of prejudice. (*Id.*) Furthermore, the Commonwealth speculated such an argument by the Defense and submitted to the trial court there was no merit to said suppression issue. (*Id.*)

As to issue 4, *failure to raise history of A.K.'s delinquency on cross-examination,* the Commonwealth argued there was no prejudice because it believes there is not a reasonable probability that the jury's findings as to the credibility of Victim's testimony that she was punched twenty (20) times and kicked five (5) times by the Defendant would change in light of the history of A.K.'s entire delinquency. (*Id.* at 63-64.) The Commonwealth, however, conceded there does not seem to be a reasonable strategic basis for Mr. Hughes' to have failed to raise A.K.'s entire delinquency and highlight her incorrigible behavior. Moreover, the trial court noted it did cure some of the prejudice *sua sponte* during the trial. (*Id.* at 64.)

As to issue 5, *cross-examination and the introduction of prior OCY/CYS investigations into Defendant,* the Commonwealth argues that Mr. Hughes' was not ineffective because the first introduction of the prior OCY/CYS involvement was volunteered spontaneously by A.K. on direct examination, not by Mr. Hughes. (*Id.* at 64.) Mr. Hughes, the Commonwealth argued, was likely employing the strategy of

20

"COIS", or "cat is out of the bag", meaning Defense Counsel attempted rehabilitation by eliciting testimony regarding the prior investigations by OCY/CYS in order to illustrate to the jury that those prior investigations were concluded as "unfounded". (*Id.* at 64-65.) Though, the Commonwealth also conceded another strategy might have been to ask the trial court to strike the unsolicited testimony by A.K. (*Id.* at 65.)

As to issue 6, *failure to properly interview and prepare character witnesses prior to trial*, the Commonwealth argued lack of prejudice because the testimony that was elicited from said character witnesses was favorable to Defendant. (*Id.* at 65.) In addition, the trial court instructed the jury that character evidence, alone, could raise reasonable doubt. (*Id.* at 66.)

As to issue 7, *introduction of prejudicial evidence on direct examination of Defendant*, the Commonwealth argued there is no underlying merit because, again, A.K., was the first witness to introduce the prior OCY/CYS investigations. (*Id.*) As to the statement made by Defendant to A.K.'s principal that "I'm not coming down there" to pick up A.K. after she was suspended; the Commonwealth believed that to be "totally understandable [...] in that context," and thus is not prejudicial to Defendant. (*Id.*)

As to the seventh and final issue, *failure to file a post-sentence motion despite still being trial counsel of record*, the Commonwealth argued there is no prejudice because a timely post-sentence motion was, in fact, filed, albeit *pro se*. (*Id.* at 66-67.)

At the conclusion of the Commonwealth's closing argument, the trial court denied the request for continuation of the proceedings in order to again subpoena Mr. Hughes' for his testimony as to his potential trial strategy. (*Id.* at 69.) After the trial court researched and reviewed substantive and procedural law pertaining to the analysis of ineffective assistance of counsel claims; heard both counsels' concession there is no such case law directly on point to the issue of whether testimony from trial counsel is required to in order to find ineffective assistance of counsel; and after the undersigned held a side bar conference with both counsel; the trial court decided such testimony by Mr. Hughes was not necessary for

21

it to find that he was ineffective. (*Id.* at 69.) The trial court noted the cumulative effect of his unpreparedness for trial illustrated his lack of trial strategy, but its decision did not pin on the cumulative effect as it was constrained by the case law respecting ineffective assistance of counsel. However, the trial court was able to make its final decision after finding the cumulative effect of his unpreparedness implies lack of any trial strategy, let alone neither the undersigned nor either counsel could come up with a fathomable, reasonable strategic basis for the highly prejudicial information that Mr. Hughes elicited during his direct and cross-examination, which was not first elicited by the Commonwealth. (*Id.* at 69-75.) The trial court placed such reasoning on the record at the conclusion of the December 19 Hearing, as follows:

> THE COURT: The [c]ourt does not feel based on the evidence presented, the trial transcript, which the [c]ourt has reviewed, and the arguments of counsel, that it needs any further testimony. But as I did state on the record previously, while Mr. Hughes was subpoenaed for today by the Commonwealth and never informed the Commonwealth he was unavailable to attend and did not inform the [c]ourt until after the close of business on Friday, and today is Tuesday, that if either counsel wishes to have Mr. Hughes present for examination, I will permit that.
>
> MR. CAGLIA: No, Your Honor. I believe the record is clear enough without him, and his testimony would add nothing as far as advancing the trial strategy.
>
> THE COURT: And [...] would the Commonwealth wish to have Mr. Hughes present?
>
> MR. BARNES: The Commonwealth believes he needs to be present for reasons already stated, Your Honor.
>
> THE COURT: Meaning that defense has the obligation of putting Mr. Hughes on the stand to support their case?
>
> MR. BARNES: Correct, Your Honor.
>
> THE COURT: Thank you, [Commonwealth]. Mr. Caglia, do you wish to proceed with the testimony and the evidence presented?
>
> MR. CAGLIA: And the pleadings, Your Honor, in particular paragraph U [of the Defense Supplemental Post-Sentence Motion] and the Commonwealth's answer to it.

22

THE COURT: In case it was not clear on the record, the trial transcript will be moved into evidence, and we will just make it Judicial 2 and 3. That would be the transcript from January 19 and January 20th.

[...]

Based on a review of the entirety of trial transcript, the [c]ourt's recollection of the trial in this matter, the testimony presented for this motion and the arguments made by counsel, the [c]ourt finds the following, in accordance with standard by a preponderance of the evidence, as it relates to the ineffective assistance of counsel claim.

This claim is of arguable merit. While there were arguments appropriately made by the Commonwealth that there were questionable behavior by counsel, certain behavior, such as, not filing a motion to suppress, not objecting to the [c]ourt's voir dire questions, not preparing character witnesses, those, by way of example, while collectively concerning, based on Mr. Hughes' behavior and appear [sic] lack of preparation for trial, would not prejudice the [D]efendant, as they were either cured by the [c]ourt, such as the voir dire questions were given, had no prejudice, for example, the character witnesses who testified favorably for the [D]efendant, and the failure to file motion to suppress based on the [c]ourt's review of the facts presented in this case, the motion to suppress would have failed and would have been denied. So, therefore, those are examples of concerning actions by defense counsel but would not have prejudiced the [D]efendant.

But when we look at the cumulative effect of defense counsel's action, from an overview, he appeared unprepared for trial. Now, appearing unprepared for trial in and of itself does not make counsel ineffective. What did make counsel ineffective in this case are the specific comments and evidence he brought out that would not have been permitted in this courtroom if presented by the Commonwealth, should not have been presented by the defense, and had no reasonable strategic basis as part of this case. And specifically what I note is mentioning of any OCY contact related to this case or any prior case related to the victim daughter in this case, and as defense counsel raised it, related to the son in this case, who was not at issue at all, of raising questions of any prior aggression or disciplinary action against the victim or her brother in this case by mom in the past.

They were eliciting testimony – defense counsel elicit[ed] testimony from the victim regarding her fear of mom based on prior actions; her OCY contact, mom's prior aggression, none of which came out on behalf of the Commonwealth's questions, nothing was elicited by the Commonwealth. All of this prejudicial information was raised on behalf of the defense, raised by defense counsel, which clearly was prejudicial to his client.

This case should have been limited to the facts of the day in question and whether or not mom's actions were excessive, were permitted by way of

23

corporal punishment, or excessive rising to the level of criminal action. But defense counsel instead put forward this information in a way that the [c]ourt cannot fathom any strategic basis for that action.

As a result of that, this was not such a clear cut, slam dunk case that, even in light of this, that the [D]efendant would have been convicted, but for these errors, there is a reasonable [probability] that the outcome of this proceeding would have been different. And, as such, the [c]ourt finds that Evan Hughes was ineffective in his representation – and let me add to that. When we look at the cumulative evidence as placed on the record by Mr. Caglia both in his pleadings and as part of the hearing today, cumulatively, there is substantial concern for this [c]ourt that Mr. Hughes was not prepared to represent Miss Keller, and for the reasons placed on the record, his ineffectiveness was prejudicial [...].

But additionally, it is the cumulative effect that also highlights that there could be no strategic basis for this decision because there doesn't seem to be a lot of strategy in anything Mr. Hughes did in this case.

As such, Mr. Hughes is found to be ineffective, and the verdict from the original trial will be vacated, and we will schedule this matter for a new trial. [...]

(*Id.* at 69-75.)

The trial court's ruling after the December 19 Hearing was memorialized in the subsequent Memorandum issued on December 20, 2017, and docketed on December 21, 2017. (*See* "Memorandum", 12/21/17.) The trial court found the underlying Defendant proved, by a preponderance of evidence, that her prior trial counsel, Evan Hughes, Esquire, was ineffective in his representation of her. (*Id.*) As such, the trial court vacated the jury's verdict and granted the underlying Defendant a new trial. (*Id.*) Additionally, the undersigned granted the Commonwealth's oral request at the time of the Hearing to recuse from presiding over the new trial, and the matter was assigned to the Honorable William R. Carpenter. (*Id.*) Finally, it was ordered that appointed private counsel, Dennis Caglia, Esquire, would continue his representation of the underlying Defendant through the new trial. (*Id.*)

On January 18, 2018, Appellant filed its Notice of Appeal from the trial court's decision at the December 19, 2017, Hearing. (*See* "Notice of Appeal", 1/18/18.) On February 7, 2018, the trial court directed Appellant to file a Concise Statement of Matters Complained of on Appeal ("Concise

24

Statement") pursuant to Pennsylvania Rule of Appellate Procedure (Pa. R.A.P.), § 1925(b). (*See* Court Order, 2/7/18.) Appellant filed its timely Concise Statement, raising the following two (2) issues:

1. THE TRIAL COURT ERRED IN FINDING THAT TRIAL COUNSEL WAS INEFFECTIVE, AND THEREBY GRANTING DEFENDANT A NEW TRIAL, WHERE THE DEFENDANT FAILED TO MEET HIS [SIC] BURDEN OF PROVING INEFFECTIVENESS. THAT IS, DEFENDANT FAILED TO ESTABLISH THAT THE CLAIMS RAISED IN HIS [SIC] *SUPPLEMENTAL POST SENTENCE MOTION AND REQUEST FOR UNITARY RELIEF* HAVE ARGUABLE MERIT, THAT COUNSEL HAD NO REASONABLE BASIS FOR HIS ACTIONS OR INACTIONS, AND THAT HE [SIC] WAS PREJUDICED BY COUNSEL'S PURPORTED INEFFECTIVENESS.

2. THE TRIAL COURT IMPROPERLY RELIED ON THE "CUMULATIVE EFFECT" OF COUNSEL'S ACTIONS IN FINDING THAT TRIAL COUNSEL WAS INEFFECTIVE.

(*See* Appellant's "Concise Statement", 2/27/18.)

## DISCUSSION

### I.   STANDARD OF REVIEW

The trial court will collectively dispose of both issues raised by Appellant in its Concise Statement, as both reláte to the standard of proof for claims of ineffective assistance of counsel on unitary review. The Superior Court "will review claims of ineffective assistance of counsel on direct appeal only where the trial court has addressed the claims on the merits after having determined that the existing record is sufficiently developed for resolution of the claims." *Commonwealth v. Watson*, 835 A.2d 786, 794 (Pa. Super. 2003). In doing so, the appellate courts review whether the lower court's conclusions as to ineffective assistance of counsel are "warranted by determining if its findings are supported by the record and its decision is free of legal error." *Id.* at 795. This standard is essentially the same as the appellate courts apply when reviewing a PCRA court's grant or dismissal of a post-conviction petition. *See id.* "Accordingly, [the appellate courts] will apply the same standar[d]" of review, which "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Ousley*, 21 A.2d 1328 (Pa. Super. 2011).

25

**II.    THE TRIAL COURT DID NOT ERR IN FINDING THAT THE UNDERLYING DEFENDANT PROVED BY A PREPONDERANCE OF EVIDENCE THAT TRIAL COUNSEL WAS INEFFECTIVE IN HIS REPRESENTATION OF HER; AND THUS, IT WAS PROPER TO VACATE THE JURY'S VERDICT AND GRANT THE UNDERLYING DEFENDANT A NEW TRIAL.**

The trial court did not err in finding the Defense proved by a preponderance of evidence that former trial counsel for Defendant, Evan Hughes, was ineffective in his representation of her. The trial court noted the cumulative effect of prejudice caused by Mr. Hughes action and/or inaction in order to signify its corresponding finding that there was no reasonable strategy for eliciting testimony that was highly prejudicial to Defendant, and some of which would have been inadmissible by the Commonwealth. (*See* N.T. – "PCRA Hr'g" at 69-75.) Neither the trial court nor either counsel (Commonwealth and Mr. Caglia) could contemplate a reasonable strategic basis for eliciting such prejudicial information as the prior, unfounded OCY/CYS investigations that were unrelated to this matter; Defendant's prior aggressive behavior towards her children; and A.K.'s fear of Defendant – none of which was elicited by the Commonwealth. (*Id.*)

The instant case and the defense, in particular, should have been limited to the facts as stated *supra* in the first three (3) paragraphs of the Factual Summary section of the instant Opinion—the facts of the day in question, the investigation thereafter, and whether Defendant's actions permitted by way of corporal punishment, or were excessive and rising to the level of criminal action. Instead, defense counsel, Evan Hughes, put forward this highly prejudicial information in such a way that the trial court could not fathom any strategic basis for same. But for these errors by Mr. Hughes, there is a reasonable probability that the outcome of the instant matter would have been different. Thus, it was proper for the trial court to vacate the jury's verdict and grant the Defendant a new trial.

The legal standard applicable to ineffective assistance of counsel claims is well-settled. *Watson*, *supra*, at 795. In order "[t]o prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in *Commonwealth v. Pierce*, 527 A.2d 973, 975–76 (Pa. 1987): (1) the underlying legal claim

26

has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness." *See Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011) (citing *Pierce, supra*). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Watson*, 835 A.2d at 795.

Instantly, the record reflects that Evan Hughes was ineffective trial counsel for the Defendant. Specifically, and as outlined in the factual and procedural history sections *supra*, Mr. Hughes had no reasonable, strategic basis for eliciting prejudicial information to the Defendant during the trial. He failed to meet with character witnesses prior to trial and go over their testimony. *(See, e.g.,* N.T. – Jury Trial at 34, (J.K, A.K.'s brother, testifies he has not met Evan Hughes ever before); 41 (Defendant's mother testifies to same) 1/20/17.) Mr. Hughes raised additional details regarding prior, unfounded OCY/CYS investigations, which were not first elicited by the Commonwealth but were spontaneously testified to by A.K. on direct examination, and which would have been otherwise inadmissible by the Commonwealth. *(Id.* at 69-75; N.T. – Jury Trial at 49-52, 1/20/17.) Particularly, Mr. Hughes raised the issue of Defendant's prior aggression toward her children when punishing same. *(Id.)* Despite A.K.'s long history of contact with the juvenile dependency and delinquency systems, Mr. Hughes neglected to question A.K. regarding her incorrigible behavior and history, which would have supported his intent to claim Defendant's use of corporal punishment was necessary. *(See* N.T. – Jury Trial at 15-16, 40, 58, 63-64, 68, 70, 1/19/17.) Instead, Mr. Hughes elicited prejudicial testimony from A.K. on cross-examination, such that she was fearful of her mother getting physical with her when she was expecting to be disciplined for her bad behavior. *(Id.* at 63, 67-75.) Mr. Hughes also emphasized the additional damage that was caused by Defendant to A.K.'s previously-injured eye. *(Id.* at 41 (argument by Dennis Caglia, Esquire, with citations to the trial record from day 1, pages 60, 62, 64, and 67-68).) The cumulative effect of these actions and/or inactions by Mr. Hughes illustrated to the trial court his lack of any trial strategy, which contributed to the trial court's ultimate finding of ineffectiveness and lack of strategy for raising the prejudicial evidence noted above.

The trial court notes that it does not take a stance one way or the other as to the ultimate guilt or innocence of Defendant with respect to the charges against her; however, the court opines the matter here presents a case of a single, hard-working mother who was unfortunately not equipped with the best parenting skills, and as a result, had trouble with her teenage children. The trial court opines that A.K.'s stabbing of her brother and subsequent suspension from school for threatening her own friend was the "straw on the camel's back" for this Defendant, who then went on to give A.K. a physical beating. The ultimate issue of whether that physical encounter between Defendant and A.K. on November 19, 2015, amounted to allowable corporal punishment, or exceeded the bounds of the law, is up to a jury. Nevertheless, and most importantly in our criminal justice system, is the Defendant's right to a fair trial and effective representation. The trial court properly found here that Mr. Hughes did not represent the Defendant effectively at trial due to his lack of trial strategy and introduction of prejudicial evidence against Defendant, and as such, ordered the jury verdict vacated and a new trial.

## CONCLUSION

Wherefore, the trial court's December 19, 2017, Order should be affirmed.

BY THE COURT:

_____
**GAIL A. WEILHEIMER,**     **J.**

**Copy mailed on August 5 , 2018, to:**
Superior Court Prothonotary
DA's Office – Appellate Division
Defense Counsel, Dennis Caglia, Esquire

28